IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

IN RE:                          : 13-MDL-2458
                                :
                                :
                                :
                                :
                                :
EFFEXOR (VENLAFAXINE            :
HYDROCHLORIDE)                  : Philadelphia, Pennsylvania
PRODUCTS LIABILITY             : October 25, 2013
LITIGATION                      : 10:32 a,m.

- - -

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE CYNTHIA M. RUFE
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

                        JOSEPH J. ZONIES, ESQUIRE
                        Reilly Pozner, LLP
                        1900 Sixteenth Street
                        Suite 1700
                        Denver, CO   80202


                        DIANNE M. NAST, ESQUIRE
                        NastLaw, LLC
                        801 Estelle Drive
                        Lancaster, PA   17601


Liaison Counsel:        STEPHEN A. CORR, ESQUIRE
                        Mellon & Webster, PC
                        87 North Broad Street
                        Doylestown, PA   18901


                        CHRISTOPHER SCHNIEDERS, ESQUIRE
                        Wagstaff & Cartmell, LLP
                        4740 Grand Avenue
                        Suite 300
                        Kansas City, MO   64112


*Transcribers Limited*

*17 Rickland Drive*
*Sewell, NJ 08080*
*856-589-6100 • 856-589-9005*

2

```
 1    APPEARANCES:              (Continued)

 2                              BRYAN F. AYLSTOCK, ESQUIRE
                                JASON RICHARDS, ESQUIRE
 3                              Aylstock, Witkin,
                                Kreis & Overholtz, PLLC
 4                              17 East Main Street
                                Suite 200
 5                              Pensacola, FL   32502

 6
       Liaison Counsel:         MARK S. CHEFFO, ESQUIRE
 7                              Quinn Emanuel
                                51 Madison Avenue
 8                              22nd Floor
                                New York, NY   10010
 9

10    For Rosemary Pinto:       LAURA FELDMAN, ESQUIRE
                                Feldman & Pinto
11                              1604 Locust Street
                                Philadelphia, PA   19103
12

13                              CHRIS COFFIN, ESQUIRE
                                Pendley, Baudin & Coffin
14                              (No address Provided)

15
                                JOSEPH SCOTT NABERS, ESQUIRE
16                              Blizzard & Nabers
                                440 Louisiana Street
17                              Houston, TX   77002

18
                                MICHAEL L. BAUM, ESQUIRE
19                              Baum, Hedlund, Aristei
                                & Goldman, PC
20                              1500 Market Street
                                Philadelphia, PA   19102
21

22                              TIMOTHY J. BECKER, ESQUIRE
                                Johnson & Becker
23                              33 South 6th Street
                                #4530
24                              Minneapolis, MN   55402

25
```

3

1   APPEARANCES:            (Continued)

2                       KAREN BARTH MENZIES, ESQUIRE
                       Robinson Calcagne Robinson
3                       Shapiro David, Inc.
                       19 Corporate Plaza
4                       Newport Beach, CA   92660

5

6                       ROBERT C. HEIM, ESQUIRE
                       Dechert LLP
7                       Cira Centre
                       2929 Arch Street
8                       Philadelphia, PA   19104

9                       - - -

10  Audio Operator:       Erica Pratt

11  Transcribed By:       Brad Anders

12                       - - -

13        Proceedings recorded by electronic sound
     recording; transcript produced by computer-aided
14  transcription service.

15                       - - -

16

17

18

19

20

21

22

23

24

25

4

1          (The following was heard in open court at

2     10:32 a.m.)

3               THE COURT:  Good morning, everyone.

4               ALL:  Good afternoon, Your Honor.

5               THE COURT:  Please be seated.  Welcome to the

6     first status conference for MDL-2458, Effexor Products

7     Liability Litigation.  I am happy to see very familiar

8     faces, too familiar, but, anyway, welcome.

9               I was given a joint proposed agenda for this

10    status conference today, and that was submitted by

11    Stephen Corr in conjunction with Mark Cheffo, each have

12    been named already as the liaison counsel, and I

13    believe are unopposed for permanent positions in that

14    regard.

15              So, knowing each and the quality of their

16    work and dedication and commitment to their MDLs in the

17    past, I hereby approve you permanently.  We have some

18    other work to address.

19              So, I will turn to counsel.  Follow your

20    agenda and would you like to address the Court first,

21    Mr. Corr?

22              MR. CORR:  Absolutely, thank you, Your Honor.

23    Good morning.  As always, it is a pleasure to be here

24    before you and glad to be here on the first status

25    conference.

1           I have spoken since our appointment with Mr.

2    Cheffo on a couple of occasions trying to get some

3    organization started between the two parties.   One

4    thing we did do, which was pretty simple, we submitted

5    a proposed order on service just to identify the

6    defendants and how they are to be served, and that will

7    be helpful to the plaintiffs as they file their cases.

8           THE COURT:  Is that the waiver of service PTO

9    that I signed yesterday?

10          MR. CORR:  Yes, I didn't see that then.

11   Okay.

12          THE COURT:  All right.  It just got filed

13   yesterday.

14          MR. CORR:  That is.  So, the first item on

15   the agenda, we are just talking about an overview of

16   the cases.  The number of cases currently pending we

17   did attach to the joint position statement and the case

18   status report a listing, and I apologize, Your Honor,

19   it was e-mailed to Nicole late.  So, but the listing of

20   those cases -- I did go down and talk to Tom Dempsey

21   before we started today to get an updated list from

22   him.

23          I am going to have to go back and talk with

24   him again because he had on his list nine cases that

25   were directly filed in the MDL and 36 cases that had

1    been transferred in to the MDL.

2         The list that we had provided had something

3    like 44 cases pending in the MDL, or something.  I

4    forget how it was, but the numbers didn't seem to match

5    to me, so I just want to make sure with him that -- I

6    am not really sure how they come up on his reports.

7         Generally, I do check in with him before I

8    come up for a status conference to make sure that we're

9    accurate and going along.

10        THE COURT:  I question the statistical

11   process for the Eastern District of Pennsylvania as

12   opposed to MDL.  I tend to, because I have to deal with

13   the cases jointly, include direct files in the MDL.

14        MR. CORR:  Right.

15        THE COURT:  Which they are permitted to be

16   directly filed, but I don't exclude them, except

17   perhaps the clerk of court has some reason to do that.

18        MR. CORR:  Yes, he told me that that's just

19   the way the report has to be run for him.  So, he gives

20   me two different reports, and then we just add them up.

21   He says they won't include them all on one report for

22   himself.

23        THE COURT:  Well, I would like some

24   similarity at least, because the reports that he is

25   keeping get reported to the panel, which keeps

7

1    statistics, and I am often questioning that myself.

2         MR. CORR:  Okay.

3         THE COURT:  So, look into it and then we will

4    put our heads together.

5         MR. CORR:  Okay.  Great.  The other issue

6    that we had on the agenda was other jurisdictions and

7    venues.  In the joint position statement and case

8    status report we reported that there were two other

9    jurisdictions, California state court and Pennsylvania

10   state court, Philadelphia.

11        Currently, in the report we had, I think,

12   four cases pending in California.  We believe there is

13   more like six or seven that are pending in California.

14   I believe they involve McKesson, and that's why they

15   are in California.

16        There are another maybe five or six that are

17   in flux, they have either been removed or are waiting a

18   ruling on that.  There are issues there, but I think

19   Mr. Cheffo could probably address that better than I

20   can.

21        THE COURT:  All right.

22        MR. CORR:  And then in Philadelphia there

23   were three cases pending.  My understanding is that one

24   of those cases there is an agreement to remove it and

25   come here and the other two are still pending in

8

1   Philadelphia.

2          I am not sure and maybe Mr. Cheffo can

3   address this, too, but he told me that two of them had

4   praecipies and had not had complaints yet, so they

5   weren't removable yet.  So, maybe that's the issue

6   there.

7          But, other than that, those are the only two

8   jurisdictions we are aware of.  I have spoken with all

9   of the applicants for the PSC, and in that meeting I

10  was told they were not aware of any other

11  jurisdictions, so from an anticipation standpoint I

12  don't anticipate other jurisdictions to be involved

13  other than California and Philadelphia.

14         THE COURT:  Well, they have some time, and we

15  are pretty familiar with the issues.  You laid them out

16  in the joint position statement.  Of course, the

17  McKesson additional defendant is a typical way to file

18  complaints in multi-plaintiff cases in California.

19         It happens so often that I am looking for

20  what McKesson has actually been held liable for and

21  perhaps we are going to order some -- I have been

22  thinking about this and this would be something to

23  discuss with the PSC once they're formed, and Mr.

24  Cheffo, I have been thinking about ordering preliminary

25  discovery on that particular named defendant.

1      MR. CORR:  Okay.

2      THE COURT:  Because, there are allegations of

3  fraudulent joinder or a misjoinder or both, and I would

4  like to deal with that in a more factual way now,

5  Dealing with my experience in Avandia, I never did see

6  McKesson be held liable.

7      MR. CORR:  Okay.  Well, I will obviously be

8  on notice of it and also we will talk that over, I am

9  sure, at the PSC level as well.

10     THE COURT:  Okay.

11     MR. CORR:  Anticipated volume, Your Honor is

12  familiar, obviously, with the Zoloft litigation and the

13  Avandia litigation.  We do not anticipate Effexor being

14  the size of either one of those.

15     So, in discussions with Mr. Cheffo and with

16  the PSC I think everybody kind of agrees that we

17  anticipate this MDL to be somewhere between 150 to 200

18  cases, and right now that's a guess.  I mean, we are

19  just obviously early on in the litigation, but it

20  seemed to match up from both sides, speaking with Mr.

21  Cheffo, speaking with the applicants for the PSC,

22  everybody feels that that's about the size that we

23  should anticipate here.

24     THE COURT:  Okay.

25     MR. CORR:  Status of the cases currently

10

1    pending.  As Your Honor knows, several cases were being

2    pursued here in the Eastern District and they were all

3    before -- I believe they were all before Judge Ludwig

4    and some discovery had taken place there.

5           It is my understanding that three 30(b)(6)

6    depositions have been taken in those cases.

7    Approximately one to two million pages of documents

8    have been produced by the defendants in those cases,

9    and they are being held, I believe, maybe -- I think

10   Karen Menzies and Scott Nabers and Chris Coffin have

11   been working on those.  So, they have been the ones

12   that are managing those documents right now.

13           THE COURT:  All right.

14           MR. CORR:  My understanding from speaking to

15   those attorneys in those cases, there are some

16   outstanding requests for production of documents.  I

17   don't know if there were motions filed on those or not,

18   or if there are any sort of outstanding motions that

19   have to be decided, but I think that everybody

20   understands we are going to be starting anew here with

21   some of that.

22           So, there were also interrogatories

23   exchanged, and I believe there may have been some

24   responses to those interrogatories.  I am not certain

25   of that, I haven't seen it, but that's my understanding

11

1   of that.

2          I did ask if there were any pending motions

3   in those cases.  I think the only pending motions

4   before they transferred to the MDL were motions for

5   non-convenience, which obviously I think are now moot

6   given the MDL.

7          And with that I don't think I have anything

8   else.  Obviously the next issue was going to be the

9   applicants for liaison counsel, and I appreciate you

10  addressing that off the bat.

11         It is always nice not to have to talk about

12  myself.

13         THE COURT:  Unless there is someone in the

14  house --

15         MR. CORR:  So, I get to sit and listen to

16  everybody else.

17         THE COURT:  -- that is opposing Mr. Corr, let

18  me know now or forever hold your peace.

19         MR. CORR:  That's the question that makes me

20  nervous.  So, I don't know if Mr. Cheffo has things he

21  wants to add to this?

22         THE COURT:  Good morning.

23         MR. CHEFFO:  Good morning, Your Honor.

24         THE COURT:  As to those motions to transfer,

25  I believe that they can be dismissed without prejudice

12

1    that may come up again, given a remand for trial.

2         MR. CHEFFO:  Exactly, Your Honor.  I think

3    that's fine, Your Honor, thank you.  And as usual, Mr.

4    Corr did a thorough and accurate job, so I am not going

5    to reiterate.  I am just going to fill in some of the

6    holes where I think I might have a little more

7    information than Mr. Corr was privy to.

8         I think the numbers, you know, and obviously

9    we have less information about the numbers of cases

10   than the plaintiffs do, but what I have been told by

11   the various folks is I think his numbers are correct.

12        I think with respect to the two

13   jurisdictions, the state court jurisdictions, Mr. Corr

14   is also correct.  There was praecipies, there may now

15   have been recently in two of those cases complaints

16   filed, but I will expect that they will be removed and,

17   you know, hopefully at some point transferred to Your

18   Honor.

19        THE COURT:  Are they assigned to a particular

20   judge in Philadelphia who has been working those

21   matters?

22        MR. CHEFFO:  No, Your Honor.

23        THE COURT:  All right.  So, if there was any

24   coordination with Philadelphia it would be through

25   Judge Buddy New (ph), because he is ostensibly the head

13

1   of that mass tort program.

2           MR. CHEFFO:  Exactly, Your Honor.  I think

3   that right now if these cases are removed there will be

4   no, at least currently there will be no Effexor cases

5   in the PCCP.

6           THE COURT:  All right.

7           MR. CHEFFO:  And with respect to California,

8   that's a little bit different story.  So, there are

9   approximately six or seven cases that are in state

10  court that have been filed, removed, remanded by those

11  courts.

12          There are probably another half a dozen cases

13  that are in that process, you know, and the way the

14  process is now working is, you know, the cases get

15  filed, we remove them, typically we will ask the courts

16  to stay those cases, ask for the MDL panel to tag them

17  and transfer them to Your Honor.

18          Some judges there will kind of wait.  Others

19  will just decide the remand motions, I am sorry.  So,

20  you know, that's kind of a work in progress, if you

21  will.

22          THE COURT:  Okay.

23          MR. CHEFFO:  I think that those are -- my

24  understanding is those are California only plaintiffs

25  and I think it's the Robinson firm who has most of

14

1  those cases that are seeking the remand, and maybe

2  Karen can correct me if I am wrong on that.

3          THE COURT:  I think I saw that some

4  Philadelphia cases that were removed here already named

5  Wolters Kluwer as well?

6          MR. CHEFFO:  I think that's correct, Your

7  Honor.

8          THE COURT:  So, I can expect some more

9  motions to remand?

10          MR. CHEFFO:  I think those are Mr. Tracy's

11  and Ms. Pinto's cases.  I am not sure if I saw it.  You

12  will be speaking to that?

13          MS. FELDMAN:  I will speak to it today.

14          THE COURT:  So, her colleague will speak for

15  her today.

16          THE COURT:  You look a little bit like her,

17  the hair, but that's about it.

18          MS. FELDMAN:  I am just taller.

19          MR. CHEFFO:  So, you know, and I think

20  that's, in terms of these issues.  I and perhaps Mr.

21  Heim had a comment or may have a comment or two on just

22  the process and, you know, we can save those until the

23  end if that's appropriate?

24          THE COURT:  That's fine.

25          MR. CHEFFO:  Thank you, Your Honor.

1          THE COURT:  But, you do have an attorney at

2   your table --

3          MR. CHEFFO:  And I should have.

4          THE COURT:  -- that I don't think was

5   involved in Zoloft?

6          MR. CHEFFO:  This is Sandy Bresnick.

7          MS. BRESNICK:  Good morning, Your Honor.

8          MR. CHEFFO:  She is a partner of mine at

9   Quinn Emanuel.

10          THE COURT:  Very nice to meet you.

11          MS. BRESNICK:  Nice to meet you, Your Honor.

12          THE COURT:  And good morning to you too, Mr.

13   Heim.  All right.  Now, I think that that is a good way

14   to start.

15          I don't think it is necessary that we review

16   at this time what is Effexor and what is this MDL and

17   the claims all about, because we have two very good

18   representations of that already.

19          One is from the MDL panel itself which

20   adopted essentially the suggestions from both sides

21   that we see repeated in the joint position statement,

22   even though there are advocacy issues involved in that

23   joint position statement that we will not have to

24   address yet.

25          So, let's move on to the applications for the

16

1  plaintiffs' steering committee.  I am, of course,

2  familiar with just about every applicant and I don't

3  need you to beg me, okay?  There is not that many of

4  you.

5          There is 11 applications and yet I am looking

6  at a case, or an MDL, that is going to be smaller in

7  size.  But, sometimes the discovery necessary for these

8  cases requires the same kind of work, initially, in the

9  general issues, the general Daubert issues and choosing

10  representations that need to move forward.

11          So, I am not sure the work is going to be any

12  less, it may just be less intense at certain times.  I

13  also am looking at selecting a group that will be able

14  to coordinate with the Zoloft and any other similar

15  type litigation, whether it is MDL or not.

16          So, I am looking for those qualities of

17  people that cannot only lead, but can direct and can

18  coordinate, and along with that your experience means a

19  lot to me.

20          One of the matters that means more to me

21  these days is that you each, individually, and your

22  firms have cases in the MDL where it is your primary

23  focus.

24          I am not interested in helping build a state

25  inventory of cases, not that occurs very often, but

17

1   sometimes it does and I want everyone's focus here to

2   be committed to the MDL's purpose, which is to

3   coordinate and discover and get these cases ready to be

4   tried or settled.

5           Simple, it is simple to me if I keep that

6   objective in mind.  So, if you don't have any cases in

7   this MDL, but I believe all of the applicants do, I

8   think it is going to be hard to get on this.  There may

9   be some time in the future where you might.

10          If you have, potentially, cases I need to

11  know how close you are to bringing them in.  There

12  aren't that many cases in the state system I just

13  heard.

14          So, if there is other things out there yet

15  unfiled you may not have to tell me about them now, but

16  just give me your landscape and your future plans and

17  that will help me.  Also, if any of you are interested

18  in a particular division of leadership or working on

19  the PSC let me know that now.

20          If any of you are interested in being a state

21  coordinator, a multi-district coordinator, not that I

22  see too much of that going on right now and the need

23  to, it is not like we're looking for those multiple

24  Avandia cases in the tens of thousands, but I still

25  think it is always good to have a point person, so

18

1   please let me know if any of you are interested in

2   doing that as well.

3          All right.  And if there is anything to add

4   to your applications all you have to do is mention it.

5   So, we have now, in no particular order, these are just

6   the order that I think that they were filed in, we have

7   Mr. Richards?  Good morning.

8          MR. RICHARDS:  Good morning, Your Honor.  It

9   is good to be here, I appreciate seeing you again.  I

10   am glad to be a part of this.  I am Jason Richards.  I

11   am a partner of Aylstock, Witkin, Kreis & Overholtz,

12   and I am with Bryan who you know well.

13          THE COURT:  Well, I know you pretty well,

14   too, you've been involved.

15          MR. RICHARDS:  You do.  You know Bryan a

16   little bit more perhaps, but obviously Bryan is not as

17   talented as I am.  So, I will hope you will consider

18   that in making the appointments.

19          THE COURT:  That's why I am giving you the

20   second word.

21          MR. RICHARDS:  This will be my third MDL

22   before Your Honor.  I am involved in Avandia and Zoloft

23   and now Effexor.  You know, I started doing MDL work in

24   2004 with Bryan's firm and I have been primarily doing

25   MDL work since then.  I do some insurance stuff and

1  some class action stuff as well, but my main focus and

2  my career at Aylstock has been MDL work.

3        I was heavily involved in Avandia, primarily

4  because Bryan was co-lead counsel in Avandia and

5  whenever you have a partner who is in your firm who is

6  co-lead counsel of any MDL it requires a lot of

7  teamwork.

8        So, I worked side by side with Bryan on most

9  of the issues involved in the MDL in Avandia.  It was a

10  rigorous undertaking.  I do a lot of briefing work.  I

11  wrote the petition for cert in the Supreme Court in

12  Avandia which did not go so well for us.

13        But, in any event, my background really is a

14  supportive role and that's primarily because --

15        THE COURT:  On the Humana matter?

16        MR. RICHARDS:  Yes, ma'am.

17        THE COURT:  Okay.  That's the only thing that

18  I think that was actually attempted up there.

19        MR. RICHARDS:  Yes, that's the only thing

20  that was attempted and failed.  My work has usually

21  been in a supportive role and that's just because the

22  nature of my firm, everybody practices mass tort, so

23  folks like Bryan and some other partners have more

24  experience than I do, have been doing it a little bit

25  longer.

1    They get their name, you know, they submit

2    their own applications.  But, this was a good

3    opportunity for me to submit my application in Effexor

4    because Bryan is already involved in Zoloft, so, I did

5    so.

6        So, you know, it's in my application a lot of

7    stuff, my qualifications, a little bit of my background

8    is in there.  If you have any questions about that you

9    can certainly let me know.

10       THE COURT:  I don't, but how many MDLs would

11   you say you have been involved in overall?

12       MR. RICHARDS:  Probably seven or eight --

13       THE COURT:  And how many are --

14       MR. RICHARDS:  -- it dates back to Fen-Phen.

15       THE COURT:  -- currently open and active?

16       MR. RICHARDS:  I am in charge of all of the

17   SSRIs for our firm.  So, I am involved currently in

18   Avandia is kind of gone, but Zoloft is what I am

19   heavily involved in right now and I work with the PSC

20   in Zoloft and again just in brief writing, work in

21   depositions and coordinated with defense counsel on

22   PTOs and some of the standard stuff behind the scenes

23   stuff.

24       You know, I don't get a lot of credit for it,

25   of course, and that's fine with me, but I do a lot of

21

1    the behind the scenes work for that.

2              THE COURT:  You write, don't you?

3              MR. RICHARDS:  I do.

4              THE COURT:  You've written articles and

5    publications?

6              MR. RICHARDS:  I have.  I try and

7    occasionally I will get lucky and somebody will offer

8    to publish it.  So, that's a lot of what I do.

9              My experience in Avandia, you know, has

10   prepared me and I was involved in Fen-Phen and stayed

11   up all night and did all of the late night stuff in

12   Fen-Phen, because that was a tremendous litigation, at

13   least for our firm.  It kind of put us on the map and

14   got us where we are today.

15             But, I have been involved in winners, I have

16   been involved in losers.  I won't mention any names

17   other than Viagra.  But, you know, I have seen the good

18   and the bad and I know the ins and outs of the PSC,

19   because I do a lot of the PSC work.

20             I know the politics of the PSC, which is not

21   always my favorite part, but it is the part that goes

22   along with MDLs and personalities matter, and I think

23   the group we have here is a good group.  I know

24   everybody, and it is a good group.

25             I think the group that ends up, you know,

1  that the Court ends up appointing will be a group that

2  can work together, and I am excited for the opportunity

3  to make it work in that group.

4          One of the odd things for me is that although

5  when I made my application everything was fine, you

6  know, everything was good, and then lo and behold,

7  Bryan Aylstock decides to steal my thunder and submit

8  his own application.

9          I can assure the Court that wasn't

10  intentional.  We are not trying to stack the deck.

11  Things just happened that way and that's just kind of

12  the nature of the way things go.  So, I hope that's not

13  an automatic exclusion for me --

14          THE COURT:  It's not.

15          MR. RICHARDS:  -- or Bryan.

16          THE COURT:  Well, I don't know about that,

17  but it's not for you.

18          MR. RICHARDS:  So --

19          MR. CORR:  Do we get some say on the second

20  one?

21          MR. RICHARDS:  So, I don't want to take up

22  too much time because obviously we have others to talk,

23  but you mentioned the, you know, the need for

24  coordination and to kind of have somebody be a point

25  person to stay on top of what's going on in state

23

1    court.

2           I do a lot of the work with Bryan on the

3    multi-district coordinator stuff for Zoloft, so I have

4    some experience with that and I would volunteer for

5    that position to the extent the Court deems fit to

6    appoint someone in that position.

7           You know, I think the Court is well aware,

8    though your work in the FJC about the role of the

9    multi-district coordinator and how important it can be,

10   and while there is only a California litigation, you

11   know, of substance right now, you know, once this gets

12   going sometimes other cases pop up, and the Court needs

13   to be aware of other cases that pop up and what's going

14   on in litigations, where discovery is, where trial

15   dates are set.

16          So, I think it is important for the Court to

17   have somebody to be the point person to keep an eye on

18   the state court litigation, but not necessarily to give

19   a report every month, it is not necessary, but to

20   inform the Court for the openness and the cooperation

21   the Court needs to work with in state court.

22          THE COURT:  I agree with that.

23          MR. RICHARDS:  So, I would happily volunteer

24   for that position in light of the fact that Bryan stole

25   my thunder.

1          Otherwise, on a personal level, you know, I

2     am married, I have been married for ten years, been

3     with my wife for 12 years.  I am in Pensacola now, I

4     have a little baby girl who is two years old and wants

5     to know when daddy is going to be home.

6          So, I want the Court to know I say that, I

7     guess, to say when I apply to a PSC, which I have

8     actually never done before, this is my first

9     application, so when I apply to the PSC it means

10     something to me, because if I am going to spend time

11     away from my family it is going to be something that is

12     important and something I feel I want to do and commit

13     myself to doing it.

14          So, you will see me.  If you appoint me you

15     will see me at the hearings.  I am not going to

16     disappear and I look forward to the opportunity if the

17     Court obliges me to work on the PSC and help out in any

18     way I can, because although I will be multi-district

19     coordinator if the Court appoints me, the way this

20     stuff works is everybody is involved in everything.

21          So, my role won't be limited to that, it

22     would be, you know, part of my role, an important role,

23     but with a smaller PSC everybody has got to chip in.

24     So, I will be doing a lot of different things.

25          But, I look forward to the opportunity if the

1   Court were to appoint me and thank you for your time.

2   If you have any questions I will be glad to answer

3   them.

4          THE COURT:  I have no further questions.

5   Thank you.

6          MR. RICHARDS:  Okay.  Great.  Thank you.

7          THE COURT:  You're next, Mr. Aylstock.

8          MR. AYLSTOCK:  I will try to keep it shorter.

9   Good morning, Judge.

10          THE COURT:  Good morning.

11          MR. AYLSTOCK:  It is good to be back.  You

12   have my application.  Obviously, you know who I am.  I

13   have been working on these SSRI birth defect-type cases

14   since 2006.

15          A lot of or actually, everybody over there I

16   have worked with on these cases over the years, and I

17   think you have a great group to appoint whoever you

18   appoint and I know that we will work together and we

19   will work very well together.

20          In my work in Paxil is where it began over at

21   the mass tort program in front of Judge Moss.  We

22   developed some experts, we helped with the litigation

23   depository of all of the documents.  We settled the

24   cases, one case as we were walking into the courtroom.

25          So, we have worked them all of the way up.

26

1    Obviously, we are very active in Zoloft.  So, we

2    understand the issues very well with the SSRI cases and

3    look forward to working on these cases as well.  We

4    have cases, so regardless of who the Court decides to

5    appoint we have an obligation to our clients and we are

6    going to be doing that.

7         One of the things that I am most interested

8    in in the Effexor litigation is making sure that we're

9    not too far behind the Zoloft litigation.  Mr. Nabers

10   firm did do those 30(b)(6) depositions.  We do have a

11   lot of the IND/NDA documents, so we are not starting

12   from ground zero, we can capitalize on that.

13        But, I think that we can be lean and mean in

14   this particular MDL and hopefully move to at least

15   start to catch up with the Zoloft litigation in how we

16   litigate this case and move it and take more

17   depositions and so forth.  So, I am anxious to do that.

18        I am sorry that I stole my partner's thunder.

19   He absolutely does make me look good, which is hard to

20   do sometimes, but whatever the Court decides I am here,

21   I would like to participate in the leadership of this

22   case if the Court would find it desirable, because I

23   have a tendency to speak up no matter what, whether I

24   am on leadership or not.

25        But, most of all I think that this case needs

27

1   to move and it needs to move toward trial and we need

2   to keep in mind that there are a lot of people out

3   there that have taken this drug.

4           It was the number seven prescribed

5   anti-depressant, I think, in the year 2007.  So, there

6   is millions of women who have taken it and there is a

7   lot of clients that we represent.  It is certainly not

8   as big as Zoloft, but there are a lot of clients and

9   they all deserve their day in court and I am looking

10  forward to pressing them toward that day.

11          THE COURT:  Well, I know how you work, Mr.

12  Aylstock, and you got Avandia with Vance and Diane and

13  Joe and Tom off to a good start.  But, you are involved

14  in many MDLs right now.

15          MR. AYLSTOCK:  I am, Your Honor.

16          THE COURT:  In fact, you are the leader of a

17  large one, aren't you?

18          MR. AYLSTOCK:  The transvaginal mesh MDLs and

19  it is, right now, I think it is one of the largest MDLs

20  there is.  There is a very large team and that PSC is

21  56 members, I believe.

22          So, it is a very large team of people working

23  on that, and my law firm has grown from just a few of

24  us when Mr. Richards started, and now we have 16

25  lawyers and over 100 staff.  So, I do have a lot of

FORM 2094   ⊛   PENGAD • 1-800-631-6989 • www.pengad.com

28

1    support with that.

2           I, obviously, am keeping plenty busy, but I

3    would commit to you and this Court and the people I

4    represent that I would be here and I would be working

5    hard on this case as well.

6           THE COURT:  And there is no problem with,

7    should I decide to do this, naming two partners from

8    the same firm?

9           MR. AYLSTOCK:  It actually has been done.  It

10   was done in the mesh MDLs, in fact.

11          THE COURT:  It is usually a financial input

12   and a lot of firms have said to me just pick one of us.

13          MR. AYLSTOCK:  Right.

14          THE COURT:  But, I don't hear that coming

15   from you and Jason.

16          MR. AYLSTOCK:  No, Your Honor.

17          THE COURT:  Okay.  Thank you, very much.

18          MR. AYLSTOCK:  Thank you, Judge.

19          THE COURT:  And Rosemary Pinto who couldn't

20   make it today?

21          MS. FELDMAN:  Rosemary Pinto couldn't make it

22   today, but you've got me.  And I am sorry, Your Honor,

23   I had surgery two weeks ago, so I don't stand up

24   straight and I don't walk too fast.

25          THE COURT:  Are you all right?

29

1      MS. FELDMAN:  But, I am going to do the best

2  I can.  Your Honor, Ms. Pinto, we work kind of

3  interchangeable, so I am just going to talk as what our

4  work is.

5      THE COURT:  But, you still better state your

6  name for the record.

7      MS. FELDMAN:  I am Laura Feldman, for the

8  record, not Rosemary Pinto, but I am here to talk on

9  her behalf.  We have been involved in -- we started to

10  get involved in the SSRI cases in the very beginning of

11  Paxil.  We were involved in Paxil until we resolved

12  our docket, which was concluded in September of this

13  year.

14      We were actually asked by GSK to go out and

15  collect all of the remaining Paxil cases, so that they

16  could review them for disposal, which we did.  In the

17  process we acquired a fairly substantial number of

18  Effexor cases, given that it is a small number of cases

19  that are out there, so that we have 30 cases that have

20  at least passed an initial vetting process.

21      Unfortunately, because we were so involved in

22  Paxil and because I have been out with surgery and Ms.

23  Pinto is trying a Topamax case, they aren't in front of

24  you yet, but that is our next project on our docket and

25  we will have that to you.

30

1       THE COURT:  To file them directly here?

2       MS. FELDMAN:  To file them directly.  Anyway,

3  the cases that we have been involved in that have been

4  MDL cases have been Avandia, Zoloft, Yaz, Paxil was an

5  MDL to us, it wasn't to you, but it was to us.

6       We have also been involved in PPH, we still

7  do all of the PPH or we do most of the PPH in

8  Philadelphia.  We are involved in almost all of the

9  Topamax in Philadelphia, and our experience with SSRI

10  cases is probably more extensive than, I am certain,

11  anybody in the Philadelphia area, but probably most

12  people because of what got filed in Philadelphia we got

13  involved in all of those cases and we are familiar with

14  all of those cases.

15       I personally am very, very interested in the

16  science.  Ms. Pinto really has an unbelievable

17  historical understanding of what happened with these

18  SSRI cases, what's happened with the FDA because of her

19  involvement since the cases before they went to Judge

20  Moss, when they were still with Judge Tereshko in

21  Philadelphia.  So, it goes back a great deal a long

22  time.

23       Effexor is our next big group.  We are not a

24  large firm.  We don't put on that we are a large firm,

25  but we are very, very committed.  We are very committed

1   to issues that especially involve women and especially

2   involve children and that we are an all women run law

3   firm and that's something that has been very important

4   to us to keep near and dear to our hearts when we have

5   been working and that's where our next project is.

6          Rosemary has participated in three Paxil

7   trials in Philadelphia.  She is picking her second

8   Topamax jury today.

9          THE COURT:  Is that in Philadelphia?

10          MS. FELDMAN:  In Philadelphia.  The first

11   Topamax case will go to the jury, I believe, on

12   Tuesday.  She worked that up, left that when the

13   defense went on to pick the next jury with the next

14   trial team.

15          So, we have been very involved in these types

16   of cases, we are very familiar with it and while we

17   have not been in a leadership position in an MDL, we

18   feel like we have put in our time and that we would be

19   very interested in doing it and we will work very hard

20   for whatever position Your Honor would be willing to

21   give us.

22          THE COURT:  And I will say that seeing that

23   Rosemary Pinto did apply in the Zoloft litigation for

24   the PSC, even though she hadn't been selected at that

25   time she has been a committed member of that MDL.

1          MS. FELDMAN:  She is a committed -- Rosemary

2   works harder than any person I know.  So, I am sure

3   that if Your Honor is inclined to put her on it she

4   will make you proud for having done it.

5          THE COURT:  Do I get you too if I name her?

6          MS. FELDMAN:  We are the same person, I am

7   just taller.

8          THE COURT:  Thank you, thank you, Laura.

9          MS. FELDMAN:  You're welcome.

10          THE COURT:  And Mr. Coffin?

11          MR. COFFIN:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. COFFIN:  It is nice to be in front of you

14   again.  When I moved for transfer of the cases to this

15   Court my primary argument in front of the panel was the

16   efficiencies that I felt would be gained through you

17   and your staff.

18          THE COURT:  Oh, you are one of those

19   flatterers, aren't you?

20          MR. COFFIN:  Well, I am coming around to a

21   point though, Your Honor.  And I argue that the

22   efficiencies would be great because of your experience

23   not only with MDLs, but obviously with Zoloft and

24   thought later that maybe I should have some concern

25   about whether or not the burden that that puts on you

1   and your staff would be very heavy.

2          I realize that and I think all of my

3   colleagues realize that, and I am getting to the point

4   that we appreciate that you have agreed to take on this

5   task, because ultimately I do believe and I know my

6   colleagues believe that we will have a lot of

7   efficiencies in this case as a result.  So, thank you

8   for being willing to take this on and it is good to be

9   in front of you again.

10          There are three points I want to try to go

11   through quickly about my application and why I would

12   like to be on leadership in this particular case.

13   First of all, my experience in pharmaceutical MDLs is

14   extensive and specifically MDLs related to serotonergic

15   drugs, very similar to Effexor.

16          The second point I will make is my

17   involvement specific to the Effexor birth defect

18   litigation.  There is only a couple of us who have

19   actually been litigating the cases for the last over a

20   year and a half at this point, but just over a year

21   before I moved for the MDL.

22          The third point will be collaboration with

23   other colleagues and the ability to work with other

24   colleagues and I think those relationships are

25   important.  So, I want to hit those three topics.  Did

1   you have something to interject, Your Honor?

2           THE COURT:  No, I will wait.

3           MR. COFFIN:  Okay.

4           THE COURT:  I do, but I am going to wait.

5           MR. COFFIN:  Okay.  All right.  Very good.

6   So, my experience in pharmaceutical MDLs and specific

7   with regard to serotonergic drugs, I will highlight

8   four cases.

9           The first one is the Lexapro and Celexa

10  Products Liability Litigation which was in the Eastern

11  District of Missouri in front of Judge Sippel.  I was

12  co-lead counsel in that case.

13          The second, I was on the PSC, actually before

14  that case I was on the PSC in the Paxil Products

15  Liability Litigation in the Central District of

16  California.  That was in front of Judge Pfaelzer, and

17  more recently co-lead counsel in the Lexapro and Celexa

18  Marketing and Sales Practices cases, which are in front

19  of Judge Gordon in the District of Massachusetts.

20          Last, but not least, obviously appointed by

21  Your Honor in the Zoloft birth defect litigation.  And

22  I bring that up because it is important to Your Honor,

23  obviously to know about our experience, but in my case

24  it has really been focused and specific to serotonergic

25  drugs, not just pharmaceuticals, but serotonergic drug

1   cases.

2          So, the second point is my experience in this

3   actual litigation.  I filed what I think was the first

4   case, but is certainly one of the first cases in the

5   country, which is the Boyer case, and that was filed in

6   February of 2012.

7          Since that time I have been litigating

8   Effexor birth defect cases.  Currently I believe I have

9   nine cases in this MDL, but in the Boyer case I was

10  actively involved.  I was personally actively involved

11  in litigating those cases.

12         I was involved in motions practice, I was

13  involved in discovery including drafting

14  interrogatories, drafting requests, answering discovery

15  from the defendants, participating in depositions,

16  participating in multiple conferences with Judge

17  Ludwig, who you know the cases were consolidated

18  before.  So, I have been very active in this particular

19  case.

20         THE COURT:  Were they actually consolidated

21  or just related?

22         MR. COFFIN:  Well, that's a good point.

23         THE COURT:  I am not sure.

24         MR. COFFIN:  I am not sure whether they were

25  actually consolidated, I am not sure about that.  But,

36

1   anyways the point being that I have been actively

2   involved in these cases, and to be fair and complete,

3   Scott Nabers and I, Scott had cases in front of Judge

4   Ludwig as well, we really collaborated together.  Some

5   of the issues Scott took the lead on and some of them I

6   took the lead on.

7        But, suffice it to say that we have been

8   litigating this case heavily for over a year prior to

9   transfer to Your Honor or prior to moving for transfer

10   to Your Honor I should say.

11        So, my experience in this particular case

12   exists.  I'm committed to this case.  I have currently

13   over 20 cases that have been vetted.  I know that

14   that's an issue.  It's an issue for most MDL judges to

15   determine who has cases, not only has cases where they

16   represent real clients with real injuries, but they

17   have been carefully vetted to ensure that proof of use

18   exists and that science supports that injury.  I can

19   assure you that that's the case with the cases that I

20   have.

21        In that regard, I'll move to collaboration,

22   my third point.  Collaboration is very important.

23   Obviously, you know relationships among PSC members are

24   very important because we want to be a cohesive unit

25   and have the same idea about how the litigation should

1   go forward.

2          This early stage, for the MDL anyway, there's

3   not a whole lot that can be done in that regard except

4   for what I think that I would at least try to do, and

5   that is to reach out to my colleagues and talk to them

6   about the Effexor cases and their idea about

7   organization and structure and strategy.

8          I have been collaborating with Tim Becker,

9   who has made an application.  I don't think he's been

10  in front of Your Honor before, but on multiple cases

11  that we've filed, specifically Steve Corr, especially

12  in the last few months, about the organization and

13  structure for this hearing.

14         I've collaborated with Steve on the

15  documents, some of the documents that you asked us to

16  produce prior to this hearing.  And I also reached out

17  to I think everyone who has made an application because

18  I've been talking to Effexor for a long while.

19         Most recently, Brian Aylstock, and not to

20  steal Jason's thunder, I've talked to Jason

21  specifically about these cases as well.  Karen Menzies,

22  Michael Baum, obviously Scott Nabers, I really believe

23  that every one of these people I have tried to reach

24  out to and talk to about their ideas about how this

25  case should move forward.

1          And I think, as Brian mentioned and Jason,

2   you know, we're going to have a really cohesive group

3   here.  I really believe that.  We have a fantastic

4   group of lawyers with an extraordinary amount of

5   experience.  And I think that your decision, although

6   it may not be easy depending on how much you cut down,

7   it will be the right decision either way you go.

8          So I'm committed to these cases.  I have been

9   for over a year and a half.  I'm happy to be in front

10  of you, and I look forward to the opportunity to serve

11  if you see fit.

12          THE COURT:  Thank you, Mr. Coffin.

13          MR. COFFIN:  Thank you, Your Honor.

14          THE COURT:  Mr. Nabers.

15          (Pause in proceedings.)

16          MR. NABERS:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MR. NABERS:  And thank you for the

19  opportunity to appear here today.  I know you've had a

20  chance to look at my application, so I will be brief.

21          I have been involved in mass torts for a long

22  time.  I started my career as a young lawyer in 1992,

23  and as I got out of law school I started on silicon

24  breast implants.  And, as you can imagine, no pun

25  intended, that was an eye opening experience to say the

1   least.

2       From there I worked on the Fen-Phen

3   litigation.   I have been involved in the Baycol

4   litigation.   I was in front of Judge Fallon in the

5   Vioxx litigation.

6       During the last seven years, I've spent most

7   of my time working on SSRI litigation.   I was involved

8   in the Paxil litigation.   My firm is with Mr. Ed

9   Blizzard who is on the Zoloft PSC here.

10      We had a number of Paxil cases that were

11  filed in state court in Philadelphia, and I served in

12  that case as a liaison for the plaintiffs, and

13  fortunately we were able to resolve our cases in that

14  litigation.

15      Since then, my time has mostly been focused

16  on doing both Lexipro and Celexa.   My firm has cases in

17  the state court in Missouri and we're also involved in

18  federal court in New Jersey.

19      I have played an active role in that

20  litigation on the case selection committee, on the

21  trial selection committee, on the expert committee, and

22  I have spent a great deal of time in the last 90 days

23  taking the corporate depositions of individuals from

24  Forest Pharmaceuticals that's located in New York.

25  That's actually what I was doing yesterday in New York

1    before I came down here this morning.

2          I have also been involved in getting experts

3    for the plaintiffs' side, and we are getting ready to

4    present experts in that litigation as well.  As Your

5    Honor knows, my firm is also heavily involved in the

6    Zoloft litigation.

7          In that litigation my partner, Mr. Blizzard,

8    is on the PSC and I participate on the case selection

9    committee, on the trial selection committee.  I have

10   been involved in taking the Zoloft corporate witness

11   depositions and was fortunate enough to get to travel

12   with Mr. Cheffo to Paris to take some depositions, and

13   so that was very nice.

14         THE COURT:  There's just a part of me that's

15   still jealous, and I don't know that I can actually get

16   rid of it.  I'm trying very hard.

17         MR. NABERS:  Well, I think we should have

18   taken you, Your Honor.  You could have been --

19         THE COURT:  I think so too.

20         MR. NABERS:  -- there with us and ruled over

21   the deposition.  Currently, we're following the

22   schedule order in this court, and I actually go back to

23   New York from here to start expert depositions with Mr.

24   Cheffo.  And then not long after that I'm going to be

25   taking defense expert depositions before the end of the

41

1    year.

2           I have worked with everybody that's an

3    applicant for this steering committee in many, many of

4    these different mass torts that I've been involved with

5    and, honestly, Judge, if I was going to make a

6    suggestion to the Court, I would just say pick them all

7    because we really have all worked together for a number

8    of years, and I would love to be on the committee, I

9    would love to get to work with them.

10          I would also have to say I'm probably Mr.

11   Cheffo's favorite, so that would be another plus for me

12   to get to be on the committee.

13          THE COURT:  That's got to count for

14   something.

15          MR. NABERS:  Our firm is very committed to

16   this litigation, as Chris said earlier.  I was the

17   first lawyer to take the first three corporate witness

18   depositions for Wyeth, those were the 30(b)6

19   depositions.  They produced about 1.8 million pages of

20   documents to my firm.

21          All of those documents have been put into a

22   database, it's a searchable database.  And there are

23   several different firms, some of which are applicants

24   for the committee.  We have all been working together

25   to process those documents and to code them so that

42

1   they're easily more searchable.

2         THE COURT:  And they're available to the MDL

3   now?

4         MR. NABERS:  They are, yes, Your Honor.  And

5   we actually have done it much like the Zoloft documents

6   have been done and much like the documents that Forest

7   has produced in the Lexipro/Celexa litigation.

8         And so they are available once the

9   confidentiality agreements are worked out they are

10  available, and we can search the database, anybody

11  that's involved in the litigation.

12        I did, also, as a part of the Effexor

13  litigation, I worked on the confidentiality protective

14  order with Mr. Cheffo.  Like I said, I have been

15  involved in the depositions with him, I have been

16  involved in the discussions about the documents that

17  they have produced.

18        From the Fen-Phen litigation I have a unique

19  perspective just because I was involved in taking a lot

20  of the early Wyeth depositions.  And so I know the

21  corporate structure, I know the personnel that was

22  there, and I think that's very helpful because, as you

23  know, Effexor really started out as a Wyeth drug before

24  Pfizer purchased Wyeth.  And so I think that puts me in

25  a unique perspective in terms of knowledge about the

43

company.

I would love to serve on the committee if Your Honor sees fit and I thank you for the opportunity to be here today.

THE COURT:  Thank you, Mr. Nabers.  All right.  We are up to Michael Baum.

MR. BAUM:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BAUM:  I haven't actually been on a PSC in front of you, but I have been on a number of PSCs, maybe 20 I think, that have spanned between airline crashes to bank fraud and now, for the most part, I work on (indiscernible) type-drug litigation, for the most part, SSRIs.

I started working on SSRIs back in 1991, worked on some of the initial MDLs with respect to the Paxil Products Liability.  Our firm was the lead counsel for the Paxil Products Liability case in front of Judge Pfaelzer, worked closely with Chris Coffin in that litigation.

At the time, Karen Menzies was in my firm and we were the lead counsel for that.  She's now with Robinson Calcagni.  We've all worked together closely on the SSRI cases for probably a dozen years now.

With respect to the birth defect litigation

44

1    itself, I found some of the initial documents that

2    showed that there was a link between Paxil and cardiac

3    birth defects while we were working on another

4    litigation.

5            And that led to us surveying our database of

6    Paxil clients and finding that some of our clients

7    actually had taken the drug while they were pregnant

8    and ended up with children that had cardiac birth

9    defects.

10           That has led to our doing the initial

11   research into the science.  What is the mechanism for

12   how the drug actually causes birth defects?  It's

13   closely related to the mechanism of how it cause --

14   it's related to its alleged anti-depressant effects.

15           The set of experts helped develop their --

16   actually having worked with the ones who did the

17   initial research into the mechanism of how the molecule

18   of an anti-depressant interferes with the signaling of

19   embryonic cells, it's not just a neurotransmitter.

20   It's a signaling molecule for fetal and embryonic cells

21   as they're developing.

22           That set of scientists that developed that

23   science we've worked with and developed as our experts,

24   worked closely with the development of their expert

25   reports.

1    I'm on the science committee for the Zoloft

2  MDL birth defects cases, science committee and

3  selection committee for the Celexa/Lexapro cases.  I've

4  worked closely with developing the documents, reviewing

5  the documents, presenting the documents to the experts,

6  and presenting the documents for the depositions just

7  yesterday with Mr. Nabers.

8    I have quite a bit of experience with SSRIs,

9  the science.  I would like to be on the science

10  committee for this case, as well as I am on the science

11  committee for the Zoloft cases.

12    And I know all of these lawyers from either

13  the Avandia litigation, the SSRI litigation I've done

14  with them.  I've worked on a number of MDLs with these

15  people and would like to work with these people, and

16  will be working.

17    We represent about 30 cases that are in this

18  court or in the MDL.  I have about a total of 70

19  Effexor cases.  Some of the cases are in state court in

20  California and are joint cases with the Robinson

21  Calcagni firm.

22    I could probably keep talking.  I've done an

23  awful lot of SSRI litigation.  I could probably answer

24  a lot of questions about it.  But, I think I would be a

25  very helpful and committed member to the PSC.  I will

1 be working with them anyway because we too apply the

2 science.

3       THE COURT:  Well, I appreciate knowing that.

4 Thank you very much.

5       MR. CHEFFO:  Your Honor, sorry to interrupt.

6       THE COURT:  It's all right.

7       MR. CHEFFO:  Mr. Baum and I have talked about

8 this before, but I would just like to ask Your Honor at

9 the end if we can maybe have an in camera discussion

10 with you?

11       THE COURT:  The two of you?

12       MR. CHEFFO:  Yes, Your Honor.

13       THE COURT:  All right.  I'm sure there's a

14 good reason for that, so yes, I think we'll have time

15 for that today.

16       MR. CHEFFO:  Thank you, Your Honor.

17       THE COURT:  Thank you.

18       (Pause in proceedings.)

19       THE COURT:  All right.  Then the next is

20 Timothy Becker.

21       (Pause in proceedings.)

22       MR. BECKER:  Hi, good morning, Your Honor.  I

23 am the other new face in the crowd.  It's a pleasure to

24 appear in front of you today.  Because I'm one of the

25 new faces, let me just tell you a little bit about who

1   we are and what our firm is.

2       I've been doing mass tort litigation

3   basically since 2000-2001 when I was with Zimmerman

4   Reed, which is a, as the Court may know, a fairly big

5   mass tort firm in Minneapolis, Minnesota.

6       About two and a half years ago, my I guess

7   best friend next to my wife and former best man in my

8   wedding and I decided to form a firm together, which is

9   now called Johnson and Becker, and our practice is

10  about 90 percent committed to mass torts.

11      I worked in a number of MDLs over the years

12  ranging from Baycol to Zicam, as my application noted.

13  I took the Welding Rod case to verdict.  While we had

14  an unsuccessful verdict, was ultimately reversed on a

15  motion for a new trial before Judge Dowd in the

16  Northern District of Ohio, and then subsequently the

17  case went on to settle after I left Zimmerman Reed.

18      I've also argued before the Eight, Ninth, and

19  Tenth Circuit, and I tell you that, Judge, because I

20  think that it gives me a little bit of a unique

21  perspective and then it book ends the practice of

22  litigation.

23      There's aspects of litigation that relate to

24  how you present a case to a jury and work it up, and

25  then there's aspects of it that relate to how you

48

1   sustain those things in front of a court of appeals,

2   and I think my experience has given me some insight

3   into that.

4           There are two primary reasons, Your Honor,

5   that I have applied in this case because we did not

6   make a similar application in the Zoloft litigation.

7   The first relates to a commitment that we have to this

8   case.

9           As Mr. Coffin alluded to, we are working

10  these cases together.  Currently, we have nine

11  plaintiffs on file here in federal court.  I believe

12  Mr. Coffin filed along with me the second case, second

13  Effexor case in the country.  We filed I think the

14  third through fourth or fifth after that, and we have

15  another 13 or so that have completed our vetting

16  process in which we anticipate filing shortly into this

17  court.

18          So we have an inventory, represent a number

19  of clients somewhere north of 20, and that's important

20  for a couple of reasons.  First, as I tell people both

21  in my firm and outside when they ask me what I'm doing,

22  this is in times my favorite and least favorite case to

23  work on.  And the reason for that is the same.

24          Unlike any other clientele that I have, the

25  plaintiffs in this case are probably the most deserving

1  that I represent, which is not to say that ultimately,

2  this will be a successful litigation or not.  It is

3  just to say that when you represent a child it brings

4  into your focus different things than when you

5  represent somebody who has had the benefit of a long

6  life.

7          So I have sat in living rooms with the mom,

8  with the dad, and with the four year old and five year

9  old, and seen the struggles that that particular child

10  has.

11          And I note that because I think it is what

12  compelled us to step forward in this case, because we

13  made a commitment to those parents, we made a

14  commitment to those kids, and we'll make the same

15  commitment to you.

16          We were in this case from the beginning,

17  we'll be in in the middle, and we'll be in at the end,

18  and we will be in that because we have a profound sense

19  of trying to seek justice on behalf of our clients, who

20  in these cases, as you know, are children.

21          The second reason we made an application is I

22  think it goes to our core philosophy as a law firm,

23  which is this.  We think that cases ought to be run by

24  people who have cases.  They have a particular interest

25  in getting an outcome for the clients.  They have a

1  particular awareness of the fact that there's a client

2  at the end of the case, and that is what compels the

3  decisions that they make.

4       And it is for that reason that you did not

5  see us apply in the Zoloft case, where we have a very

6  limited inventory, and as you're well aware, they're

7  wonderful attorneys representing the plaintiffs in that

8  case and carrying the water on behalf of firms like

9  myself.

10      Here, we think it's a little different, and

11 the reason for that is this.  I agree with what Mr.

12 Corr told you, that at the end of the day this case

13 will likely have somewhere between 150 and 200

14 plaintiffs involved in it.

15      Because of that, currently we represent seven

16 to ten percent of what the inevitable universe of cases

17 will be.  And as a result of that, there is a

18 significant likelihood that one of my clients will be

19 selected as a bellwether client somewhere down the

20 road, or bellwether case, either by the plaintiffs or

21 by Mr. Cheffo and his colleagues.

22      Now, I've been on both sides of that aisle

23 where I've had bellwether cases selected where I was in

24 the case, and where I had been involved in leadership

25 and where I understood the documents and the science.

1    And then I've been involved where the call
2    came one day and said congratulations, you have a
3    defense bellwether pick.  And I can assure you that my
4    level of preparedness in those two situations was
5    fundamentally different.
6        So, because of the fact that we believe that
7    one of our cases at least will go through the vetting
8    process, we think that we have an obligation to stand
9    up on behalf of our clients and ask to be selected for
10   this case.
11       Finally, I'll echo what my colleagues have
12   said, which is I've worked with almost every one of the
13   lawyers in this case, whether directly in litigation or
14   through AJ or, you know, plaintiffs organizations.  I
15   like all of them a great deal.  I believe our firm can
16   contribute to this case and I would ask to be selected
17   as a member of the PSC.
18       THE COURT:  Thank you.
19       MR. BECKER:  Thank you, Judge.
20       (Pause in proceedings.)
21       THE COURT:  Next is Diane Nast.
22       (Pause in proceedings.)
23       MS. NAST:  Good morning, Your Honor.
24       THE COURT:  Good morning.  Now, you don't
25   have to tell me everything you've done.  I know what

1    you've done.

2            MS. NAST:  Oh.  And I promise you I won't do

3    that.

4            THE COURT:  But, I just need to know where

5    you see yourself and what role in this type of

6    coordinated litigation.

7            MS. NAST:  Your Honor, I am happy to serve in

8    whatever capacity, if any, that you think is

9    appropriate in any of the positions in which people

10   serve.

11           I am currently, as you know, co-lead counsel

12   in Zoloft.  I was co-lead counsel in Darvon, that case

13   has been resolved.  So I have the time to make the

14   commitment to serve in any capacity in this case that

15   you find appropriate.  And I suspect you have a plan or

16   at least the outline of a plan for what you think is

17   appropriate here, and if I fit into that plan, that's

18   good.

19           It's interesting to note the three MDLs that

20   you've had.  In Avandia we ended up with what, 60,000

21   cases, not filed cases, but 60,000 cases.  There were

22   17 people I think on that steering committee

23   ultimately.

24           THE COURT:  At the end, yes, when they had

25   been added.

53

1      MR. NAST:  And in Zoloft, we're maybe going

2   to have 450, 500, perhaps a little bit more cases.  You

3   had 32 applications for the steering committee, and 17

4   people were selected to serve on the PSC.

5      Here, we have a smaller number of cases, but

6   as you have noted, the level of work is not

7   significantly different.  You still have to take the

8   discovery, take the depositions, get the documents, and

9   so forth.

10      So, however many people you find appropriate

11   to appoint to the leadership positions, you at least

12   have to deal with a much smaller applicant group than

13   you had in the other cases.  Counting Steve, I think

14   there's 12, and I think that was your count as well.

15      The only thing I would say about myself is

16   that one of my strongest values in litigation is

17   civility.  And some of my colleagues from time to time

18   say that's softness.  I don't think it's softness.  I

19   think it's a much easier way to get agreement rather

20   than to end up, you know, head-to-head.

21      Then I only have two other points to make.

22   One is if you put both Brian and Jason on the

23   committee, I think they should pay a premium

24   assessment, not just a regular assessment.

25      THE COURT:  Like Cadillac --

1        MS. NAST:  Yeah, exactly.

2        THE COURT:  -- medical insurance?  Yes.

3        MS. NAST:  And then, secondly, not to

4   disagree with Mr. Nabers, but I think I could say that

5   both Mr. Cheffo and Mr. Heim might pick me as their

6   favorite.  And unless Your Honor has any questions, I

7   have nothing to add.

8        THE COURT:  No, as usual, I appreciate your

9   interest and assistance.

10       MS. NAST:  Thank you.

11       THE COURT:  Thank you.  Okay.  Now we have

12  Mr. Zonies.

13           (Pause in proceedings.)

14       MR. ZONIES:  Good morning, Your Honor.

15       THE COURT:  Why are you looking at the clock?

16       MR. ZONIES:  I just wanted to make sure it

17  was still the morning.  No offense, Jason.  As always,

18  it is a great pleasure to be before the Court.

19           I believe this is almost exactly six years to

20  the day when I stood here for the first time, and I'm

21  thrilled and proud to be doing it again six years later

22  with more gray hair and a couple more inches around the

23  waist.

24           Another great cause, another great group of

25  people to potentially work with, save Brian.  And in

probably, as you know and I've said before, my favorite

place to be in court, on my feet in front of fantastic

support.

And if Cheffo gets under oath, he'll admit

it's actually me, and I think Bob Heim would too, as

their favorites.  I'm still working on the corner over

there of the table.

It would obviously be a great pleasure to

serve the Court again on a PSC in any capacity.  I look

forward to the opportunity to lead from the front for

this Court at any point in time and will keep knocking

on that door with any of these fine lawyers, many of

whom I consider very good friends, some who I'm not so

sure they would say that about me, but all great

lawyers, all good colleagues, and we'd like to serve

for the Court in any capacity.

THE COURT:  Thank you.  I do know how hard

you work, and you actually litigated many matters in

Avandia before me.  So I know the quality of your

litigation skills as well, and that was on the science,

as well as other matters.

So I'm looking forward to having you

participate here, and I'm trying to figure out how you

and others of your wonderful co-colleagues here

applying that are so involved in Zoloft, does that make

1    it easier or more difficult to coordinate between the

2    two?

3           I already saw the common issues that emanate

4    from natural litigation in taking depositions.  And you

5    think you have the ability to cut through that with

6    this fine group and with Zoloft?

7           MR. ZONIES:  I think that it actually is a

8    great opportunity to help both cases move more

9    efficiently to have a core group here in Effexor that

10   can help with civility continue, you know, to focus and

11   drive both cases simultaneously, particularly since we

12   have the same esteemed opposing counsel.

13          And we've learned a lot already in Zoloft

14   that I think can help us drive Effexor more

15   efficiently, which I think will bring truly a

16   congruence of these cases moving forward more quickly,

17   more efficiently, driving them to their ultimate

18   resolution.  I mean I think this is actually a great

19   benefit to Zoloft that this case exists.

20          THE COURT:  I hope so.  Otherwise, it's going

21   to be a nightmare on two fronts.

22          MR. ZONIES:  Yeah.  That possibility exists,

23   but I don't think with the group and the Court that's

24   running this that that's a problem.  I think actually

25   it's a benefit.

1          THE COURT:  Well, we count on your

2    professionalism.  Thank you.

3          MR. ZONIES:  I'll try to look for that in my

4    bag over there, Your Honor.  Thank you.

5          THE COURT:  I want to say that when it comes

6    to civility every one of you treats each other in just

7    the way that I would hope.  But, I've noticed, like

8    Diane Nast has noticed, that if men choose the term

9    "civility" or act that way, they are labeled

10   professionals.  This is professionalism.  And if women

11   do it, we're soft.  So, you know, we take it on the

12   chin and then we keep moving on, right?

13         MS. NAST:  That's correct, Your Honor.

14         THE COURT:  But, it is the way I expect my

15   attorneys in my MDLs to operate.  And I don't expect

16   anything different from any of you, so this is all good

17   news.  All right.

18         MR. CORR:  I've never heard anyone call Diane

19   soft, Your Honor.  Civil, yes, soft, no.

20         THE COURT:  Well, they don't after they know

21   her or me.  Okay.  Mr. Schnieders.

22         MR. SCHNIEDERS:  Good morning, Your Honor.

23   My names is Chris Schnieders.  It's actually

24   Schnieders.

25         THE COURT:  Schnieders.

1    MR. SCHNIEDERS:  It's I before the E.  I

2    don't know if that's an Ellis Island mix up or what,

3    but for whatever reason the I is before the E and so

4    I'll forever be known as Chris Schnieders.

5    THE COURT:  I'll try to remember.

6    MR. SCHNIEDERS:  Your Honor, I'm with the law

7    firm of Wagstaff and Cartmell.  You're very familiar I

8    know with Tom Cartmell, through the Avandia and the

9    Zoloft litigation.  He was up here many times speaking

10   with you and having the opportunity to address you.  I

11   spent most of those times with many attorneys back in

12   those seats back there, so I'm honored by the ability

13   to sit here and talk with you today.

14   Every one that is on this panel is obviously

15   highly qualified, and I'm honored to be a part of the

16   group that has applied for this PSC here today.  That

17   being said, I'm going to highlight a couple aspects of

18   my application.  I know you've reviewed it, and there's

19   nothing else in there that I particularly have to add

20   other than to highlight a couple of things.

21   I believe it was the painter, Benjamin Haydon

22   that said "Never suffer youth as an excuse for

23   inadequacy," and that's something that I have taken to

24   heart in my career.  I believe that I owe it to my

25   clients to be as capable as anyone that I'm around at

any point.

I don't have the CVs that some of my colleagues here today speaking to you have.  I don't have the PSC appointments that have been present in the past, but I have done the work on both a micro and a macro level.  When I say that, I've done the PSC level work.  Dating back to Celebrex, Bextra, I helped work up trial picks.

In the Avandia litigation I was on the Daubert committee, I was on the science committee.  And every one of those hearings we had where Jill and Tom did such a great job on science day I was sitting in that box over there helping the team move along, so I've worked on all that.

I took expert depositions in that case.  I helped work up the trial package and was one of the lawyers that was lucky enough to be here when the Burford case was about to be tried on that trial team.

So I've worked in the past in the Zoloft litigation.  I've been lucky enough to have been asked to take numerous depositions.  And that's an honor that I've been trusted with that and I appreciate every aspect of that.

I also serve on the marketing and on the --
I'm sorry, the marketing and the discovery committees

60

1   in that litigation, and those are a couple of areas

2   where we feel like we're really starting to push to be

3   able to do what we need to for our clients and to help

4   move that litigation forward as it is moving and

5   progressing now.

6           I also, in that litigation, serve as the

7   deposition coordinator, and so I've had the opportunity

8   to talk and meet with Mr. Cheffo and several of his

9   colleagues numerous times.  I get along with each and

10  every one of them.  We may not always see eye-to-eye on

11  what the issues are, but we've always been very

12  respectful of one another, and I would certainly expect

13  that to continue.

14          I've had the opportunity to work with

15  everybody in this box.  I will continue to work with

16  everybody in this box.  And I appreciate having such

17  high quality colleagues to be able to work on cases

18  such as this.

19          On the micro level, which is, you know, more

20  the case specific side of things, I have the

21  opportunity, and I have a strong base and still do,

22  with working in case-specific issues, with talking to

23  the clients, with working on things like plaintiffs'

24  fact sheets, explaining to clients what's going on on

25  the upper levels of the litigation, you know, why

1   things take as much time as they do, what's happening,

2   and the fact that there's not just an inert movement on

3   the -- on the entire case.

4          I think something that I could bring to this

5   PSC is the ability to take the macro and the micro and

6   juxtapose those together in order to make it the most

7   efficient PSC that it could be, and also to help along

8   in the Zoloft litigation where I'm highly involved in

9   these issues as well, and I believe that we can get

10  this to dovetail very nicely.

11         We do have an inventory at Wagstaff and

12  Cartmell, and I am counsel of record in the case that's

13  filed before Your Honor at this point.  I would just

14  close by saying that I would appreciate the honor of

15  being named to this PSC and I humbly ask for that.  And

16  I'd like to answer any questions you might have.

17         THE COURT:  I don't have any questions

18  because I know that you have been working on the other

19  matters, not because I saw you here, but because your

20  name is on every pleading that came out of the

21  litigation.  So I know that you were right in there, so

22  thank you.

23         MR. SCHNIEDERS:  Thank you, Your Honor.

24         THE COURT:  Karen Barth Menzies.

25         (Pause in proceedings.)

62

1          MS. MENZIES:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MS. MENZIES:  I'm Karen Barth Menzies from

4   the firm of Robinson, Calcagne, Robinson, Shapiro,

5   Davis.  It's a pleasure to be before you again.  This

6   will be my second application to the Court.  I was

7   involved in the Avandia cases for awhile in the PSC and

8   then kind of got a little distracted into the Paxil

9   world, and I apologize for that, but have used a lot of

10  that experience I think to the benefit of this

11  litigation.

12          For starters, I would like to say that I'm

13  delighted by the group of people we have here.  You

14  know, a lot of times we come to these MDLs and there's

15  some people that stick out like sore thumbs, and you're

16  kind of wondering oh, I didn't even know they were

17  doing that litigation, and I can't say that about this

18  group.  I'm just thrilled that we've got a wonderful

19  team and I'm really looking forward to working with

20  them, regardless of whether I'm appointed.

21          To start off, as my experience, I think that,

22  you know, we always see each other in different

23  seminars and conventions and people always say what are

24  you working on, what are you working on.

25          And I think for the last 15 years I've been

63

saying the SSRI cases.  This has been an area of dedication for me in my career.  I believe very strongly in these litigations.

In 2001, I was appointed lead counsel of the MDL, the Paxil withdrawal MDL with Judge Pfaelzer in the Central District of California, and that was really my first introduction to MDLs and I kind of learned a lot along the way.

But, I was happy to report that we had a very contentious fight for a number of years with very able lawyers at King and Spalding.  Chilton Varner in particular was my counterpoint, and by the end of the day, we ended up settling the litigation less than a month before our first trials.

And thereafter, when we settled our inventory we didn't continue with cases, but myself and Ms. Varner assisted the mediator on Judge Pfaelzer's request and continued to get the rest of the litigation settled, including me acting as liaison counsel for the other plaintiff's counsel and in pro per plaintiffs, and were able to resolve those cases, over 3200 cases.  So it was a proud accomplishment for me and my real introduction to the MDL world.

It was followed by appointment in 2006 as co-lead of the Paxil, co-lead and liaison counsel for the

64

Paxil mass tort program, which was run similar to an MDL.

And what we did there, and a large part of our group is here today still, we setup -- I was co-lead with Clayton Clark, and what we had done is setup a real cohesive group of individuals, and I was responsible for kind of the management of that group, and that's why I've come to this Court seeking an appointment to leadership because I can say I value very highly the input of my colleagues.

I also value the organization and keeping the group moving.  In that litigation we had weekly calls with a formal agenda, and my task was to run those weekly calls, setup the agenda, and assign tasks, and most importantly, follow up on tasks to make sure that we continue to move the cases forward in litigation and to continue to get input in the valuable work from the entire group.

We housed the documents for that litigation, gave access to them.  There wasn't a formal MDL so we just setup an informal working group, and we made sure that everybody had access to those documents as they needed, as well as once we settled our inventory, which was in about 2010, we didn't continue with further cases, but even to this day we still house that

1  document depository and have assisted plaintiffs in

2  especially where to go to get to Lauren Rosemary if

3  they're needing updates on a litigation.  So we

4  continue to play that role.

5          And I would say an important part of my

6  focus, as you know, I've been working on the Zoloft

7  cases with my partner, Mark Robinson.  Effexor in

8  particular to me is important.

9          We had filed some cases in California before

10 the petition for the MDL was filed and, frankly, the

11 answer or the reason we did that was because we didn't

12 think it was going to be that big of a litigation.  I

13 still don't think it's going to be that big of a

14 litigation.  I think Mr. Cheffo is correct, we're

15 looking at around 150 cases, maybe 200 at the end of

16 the day.

17         We have five cases pending in California

18 right now, and there is a JCCP that's been appointed.

19 Since the MDL petition was filed, we have submitted --

20 we filed a number of cases and now currently have 32

21 before Your Honor, and so I'm looking forward to

22 actually working in the California case in conjunction

23 really with the leadership here in the MDL.

24         I have had a tolling agreement on these cases

25 with counsel for six years.  I have clients that I have

1    represented that long.  And, as I have told you, I have

2    quite a few clients in this litigation.

3           I really, really am looking forward to this

4    case moving forward quickly, as quickly and as

5    efficient we can.  And I am all about professionalism

6    for sure, and I think we need to be, and I believe you

7    need to choose your battles, but I also think we need

8    to do what's necessary to bring the issues in dispute

9    to the Court, get them resolved in moving forward

10   quickly.

11          We are housing documents for the Effexor

12   litigation.  I've been working with Mr. Coffin's firm

13   and Scott Nabers in doing that and yes, those are

14   available.  We can sort of just parlay those into the

15   group, into the MDL.

16          In this situation we haven't been using an

17   outside vendor, we have been doing it inhouse.  I think

18   it's been very efficient.  If we need to expand that

19   and get more help, we certainly are willing to do that.

20   But so far, we have been running it in a very efficient

21   manner.  And I think that's just my main point, unless

22   you have any questions.

23          THE COURT:  I don't.

24          MS. MENZIES:  Thank you, Your Honor.

25          THE COURT:  I know your qualifications.

1    Thank you.

2              MS. MENZIES:   Thank you for your time.

3              THE COURT:   Is there anyone else that needs

4    to address the Court?   I would want you all to

5    understand how appreciative I am of your willingness to

6    serve yet again, and as far as I'm concerned this won't

7    be a difficult decision for me.

8              I would, however, like to speak to a number

9    of you concerning where that plan is fomenting because

10   Ms. Nast is right, I always have an idea of what I want

11   to do, but I am just experienced enough to realize and

12   practice the actual rule I've adopted, listen to the

13   attorneys because they're in the middle of it, and

14   that's all the attorneys.   And I do want to talk to

15   some of you about assuming certain positions before I

16   actually publish an order appointing those that will be

17   serving here.

18              So, I would like to speak to you personally,

19   each one of you, except everybody always seems to have

20   a flight to run to.   So, in order of whoever doesn't

21   have to -- you know, whoever has to go first, I would

22   like to see you.

23              We have not much to talk about yet on this

24   list except scheduling for future events.   And I know

25   that my law clerks have to leave so that's okay.   But

68

we won't be scheduling from the bench.  But when you
are named you'll have to give me an idea of how often
you wish to meet.

I find that meetings are productive for you
because you get other work done, but I don't think a
monthly meeting in court is necessarily necessary.  So
we'll work, as we have in Zoloft, off and on every
other month in court, and in court as needed, of
course, if there's oral arguments.  But would liaison
counsel like to address the Court?

MR. CHEFFO:  Just very briefly, Your Honor.

THE COURT:  Yes.

MR. CHEFFO:  I think that Your Honor was
actually encouraged and comforted to hear a lot of
really synergies both with what Your Honor said and
what many of the lawyers have.  And I would echo really
what they said, I think this is a, you know, a very
talented collection of lawyers in terms of their skill
set.

From our perspective and, you know, I was
going to say don't really have a dog in this fight, but
to some extent, we do, because I think it's important
that we are able to efficiently represent our clients
on both sides.

So, what I think I would urge is, you know, I

1    think experience is important in these cases.  You

2    know, as Your Honor I think said in the Zoloft

3    litigation it's true, to the extent that someone is not

4    on a PSC doesn't mean that they can't participate, and

5    we've heard that today.  There's always room.  So I

6    think that having experienced leadership is important.

7            I think that having cases and a commitment is

8    important.  We saw I think an expectation early in

9    Zoloft of thousands of cases and, you know, again, Your

10   Honor will know best about whether the size of the PSC

11   would have been the same if there was 400 cases as

12   thousands, but I think that's at least a consideration

13   because while certainly I know it makes sense on our

14   side to have the appropriate resources and certainly on

15   theirs, there can somehow be a lack of efficiency when

16   there's, frankly, more people necessary than to do it,

17   and more kind of hierarchy and chains.

18           So I'm not specifically kind of alluding to

19   any person or really commenting on Zoloft so much, but

20   just saying here I think that the PSC probably in our

21   view it works best when it's right sized to the number

22   of cases.

23           Then I think probably the most important

24   thing is a full commitment, and Your Honor said this

25   and I think some of the counsel.  And we have a unique

1   opportunity here because we do have a limited

2   university of cases.  Frankly, I'm not sure why there

3   should be any state court cases.  Every case that is

4   filed is -- first of all, there's probably less than

5   ten of them.

6          If there's only going to be 150 or 200 cases,

7   anybody who is on the PSC and on the leadership can

8   certainly file any of those cases.  There's no

9   jurisdictional issues.  Both the ones that are filed

10  can be, you know, dismissed without prejudice and

11  refiled here because the only controversy, and this was

12  not a matter of not coordinating with state courts.

13  You know, we have taken to heart, I know Your Honor has

14  made that point, if people want to file in state

15  courts, that's fine, that's their ability to do that.

16  We will coordinate as best we can with them.

17          This is not a matter of saying federal court

18  over state court, but the real question is here is so

19  have folks who are applying for a leadership position,

20  and it's hard to lead when your allegiances are between

21  state court and federal court.

22          I, again, don't see a reason at this point in

23  the litigation where we have such a unique opportunity

24  where the plaintiffs have filed an application, where

25  Pfizer supported the application that we can't do what

needs to be done in the MDL without ultimately having
to worry about stepping on toes and trial dates and
cross-noticing depositions and having other folks
involved.

So to us, that's probably one of the most
important things that I think is a fair certainly
request for Pfizer, and with all due respect, I think
it's a fair request for the Court to make of folks who
want to lead this MDL.

So, with that, you know, in terms of the
civility, the coordination, kind of the ethical, hard
fighting, I think all that we completely agree and I
would expect to take those models from Zoloft with this
group that Your Honor appoints.

THE COURT:  Thank you.

MR. CHEFFO:  I don't know if Mr. Heim has
anything to add.

THE COURT:  Mr. Heim?

MR. HEIM:  Your Honor, I think the only point
that I would make is a point that Your Honor has made
before, and that is we have seen that litigation works
best when the PSC group works well among themselves.
When they're cooperative among themselves they move
faster, and when they move faster they get to us
faster.

1    So having a group that works cooperatively

2  among themselves and works cooperatively and

3  constructively with us in trying to avoid having to

4  bring things to Your Honor so that we can move the

5  litigation because we well know, all of us now, that

6  when Your Honor sets a schedule you expect counsel to

7  keep to that schedule.

8    So I think constructively working together,

9  constructively working with us, having a group like

10  that serves everybody's interest.

11    THE COURT:  And it is the verbatim truth.

12  There's nothing like a PSC that works like the spokes

13  on one wheel instead of another way.  And I am so used

14  to Avandia and that smooth machinery right from the get

15  go, that I'm always surprised if something else

16  happens, and yet, that's got to be dealt with.  It will

17  happen.

18    MR. HEIM:  And that's the point I wanted to

19  make.  Thank you, Your Honor.

20    THE COURT:  Thank you very much.  Mr. Corr?

21    MR. CORR:  Very briefly, Your Honor.  Mr.

22  Cheffo mentioned the state court and the PSC and how

23  they coordinate.

24    I think it's also important to recognize that

25  when there are attorneys who are on the PSC who also

1    are involved in state court cases they do have

2    obligations to their clients that sometimes the clients

3    want to be in the state court and not in the federal

4    court because it's closer to their home or whatever the

5    reasons are.

6         But, it also is helpful in coordinating I

7    think because you can see some of the issues we've run

8    into in other litigations where there is an attorney in

9    state court who's not involved in the MDL and we can't

10   really get things coordinated as well.

11        When we have PSC members who are also

12   involved in this litigations we tend to be able to

13   coordinate a lot better and put the MDL first.

14        THE COURT:  I've noticed that perspective as

15   well.  It is a situation that has to be viewed with

16   balance.

17        MR. CORR:  Right.  And I appreciate the point

18   that Mr. Cheffo raised, but I think there is that

19   balance that we have to look at as well.

20        The second thing that I wanted to mention

21   that I forgot to mention earlier was that I did work on

22   a general case management order working off of the

23   Avandia and the Zoloft.  But, quite frankly, my

24   schedule wasn't really matching up very well with

25   Mark's the past couple of weeks, so I didn't get that

74

1  circulated out.

2          The other thing that we did also talk about

3  among the PSC was the protective order.  I know in Your

4  Honor's PTO-1 said that we should work on that after

5  the PSC was formed.

6          I did take an initial draft of it, started

7  working on it, circulated it around.  I know there are

8  issues that have come up in other litigations that

9  people want to talk with the other side about.  So we

10  did kind of shelve that until we have a PSC formed.

11  But we'll get on that right away and have a protective

12  order pretty soon I would think.

13          THE COURT:  All right.

14          MR. CORR:  Thanks.

15          THE COURT:  I appreciate that update.

16          MR. CORR:  Okay.  Thanks.

17          THE COURT:  Anything else?  Then I would like

18  to recess, and I think I will talk to you, Mr. Cheffo

19  and Mr. Baum, first.  And then the rest of you come

20  back one by one.  All right?

21          (Proceedings adjourned, 11:58 a.m.)

22                      *  *  *

23

24

25

1
2
3
4
5
6                          <u>CERTIFICATION</u>
7
8          I, Brad Anders, do hereby certify that the
9    foregoing is a true and correct transcript from the
10   electronic sound recordings of the proceedings in the
11   above-captioned matter.
12
13
14   _10-30-13_                      _Brad Anders_
15   Date                           Brad Anders
16
17
18
19
20
21
22
23
24
25